UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



| | | |
|---|---|---|
| ANDREWS FLIGHT OF ALABAMA, INC., | ] ] ] | |
| Plaintiff, | ] ] | |
| v. | ] ] | CV-02-BE-1760-S |
| CESSNA AIRCRAFT CO., INC., | ] ] ] | |
| Defendant. | ] ] ] ] ] | |

**ENTERED**
**JAN 2 6 2004**

## MEMORANDUM OPINION

This case comes before the court on the defendant's "Motion for Summary Judgment" (Doc. 14), the defendant's "Motion to Strike, Disregard Or For Other Relief" (Doc. 37), and the plaintiff's "Motion to Strike Defendant's 'Undisputed Facts'" (Doc. 40). Having reviewed these motions and the case file, the court hereby GRANTS the Motion for Summary Judgment and DENIES both Motions to Strike for the reasons discussed below.

## FACTS

Plaintiff Andrews Flight of Alabama, Inc. ("AFA") owned a 1985 model Citation S/II jet aircraft. In July 2000, AFA agreed to buy from Defendant Cessna Aircraft Company a new jet aircraft, the Citation CJ-1. As part of the transaction, three related contracts were signed and entered into between AFA and Cessna: (1) a purchase agreement for AFA's purchase of the new CJ-1; (2) a marketing agreement, under which Cessna's used aircraft sales department would market the S/II on behalf of AFA, and (3) a trade-in agreement, whereby Cessna agreed to

purchase the S/II from AFA for credit towards the CJ-1 in the event the S/II had not already been sold. These contracts contained "integration" clauses providing that they constituted the "entire agreement" of the parties and incorporated and superceded all prior negotiations, representations, or discussions. Prior to execution and signature, these contracts were reviewed by AFA's legal counsel, Bradley Arant Rose & White LLP. As a result of this review, several changes were made to the agreements, to which Cessna agreed. The agreements were also reviewed by AFA's accountants before being signed.

The essence of the three integrated contracts provided that: (a) AFA agreed to purchase the CJ-1 for $3,829,925; (b) Cessna would market the S/II for resale beginning no earlier than 180 days prior to scheduled delivery of the CJ-1, with sales proceeds credited against the purchase price of the CJ-1; and (c) Cessna guaranteed AFA a minimum credit of $2.85 million on the resale or trade-in of the S/II. The $2.85 million figure was the product of negotiations between Cessna and AFA.

Discussions regarding Cessna's future efforts to sell the S/II took place before these agreements were signed. The Cessna representative allegedly told Neal Andrews, the AFA representative, that Cessna had unique strengths that made it the best entity to market and sell the S/II, and that, as a result, AFA would be able to purchase the CJ-1 for only $200,000 of "new money." Mr. Andrews has since alleged that AFA relied on these representations when deciding to enter into the agreement.

The contract provided that delivery of the CJ-1 was to take place in May 2001. Beginning January 22, 2001, Cessna undertook to market the S/II aircraft. To market the S/II, Cessna advertised the plane in the Wall Street Journal and commercial aviation publications. Although Cessna normally advertises used aircraft in groups and not on an individual plane-by-

plane basis, in this case Cessna advertised AFA's S/II using both methods. Further, Cessna sent a list of all aircraft it was marketing for sale, including AFA's S/II, to its sales representatives throughout the world. Cessna alleges these efforts exceeded their typical marketing activity for a used aircraft. Cessna believes itself to be a more preferable reseller of used aircraft, as many customers prefer to purchase a used aircraft from its manufacturer, rather than from a third party. However, Cessna's used aircraft resale division was manned by only two individuals, and neither was paid by commission for their efforts. As the deadline for reselling the airplane approached, AFA became concerned about Cessna's resale efforts, and gave Cessna the contact information of several possible customers it had obtained. AFA alleges Cessna did not act on this information.

      Unfortunately, the S/II was not resold by June of 2001 when the time came for AFA to take delivery of its new CJ-1, and AFA was forced to trade-in its S/II for the agreed upon $2.85 million in credit. Cessna attributes the failure to sell to a soft market for used aircraft, and certain attributes about the particular aircraft itself, including AFA's high asking price. At the time of trade-in of the S/II, AFA was dissatisfied over Cessna's failure to find a new buyer. In an effort to appease AFA, Cessna agreed to increase the trade-in amount from $2.85 million to $2.95 million. Additionally, Cessna agreed to share any net proceeds received above and beyond $3.0 million from the eventual sale of the S/II.

      The *actual* trade-in of the S/II occurred on June 18, 2001. AFA took possession of the new CJ-1 aircraft that day as well, for which it paid the agreed-upon price of $3.82 million.[1] Cessna later sold the S/II to a third party on July 11, 2001, for $2.86 million. Because the sale price did not exceed $3.0 million, no net proceeds were shared between Cessna and AFA.

---

[1] The late trade-in/delivery was due to a "schedule slippage" by Cessna, and is immaterial in this case.

AFA brought this suit in July 2002, alleging (1) Cessna fraudulently induced AFA to enter the purchase agreement; (2) Cessna fraudulently induced AFA to enter the marketing agreement; (3) Cessna obtained money by false pretenses in connection with the transaction, and (4) Cessna breached the marketing agreement. The three agreements have a clause directing any disputes to be governed by Kansas contract law (Cessna is based in Kansas), and both parties concede Kansas law applies here.

## DISCUSSION

**I. Legal Standard**

When a district court reviews a motion for summary judgment under Federal Rules of Civil Procedure 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test. The nonmoving party may defeat the motion for summary judgment by establishing either genuine issues of material fact or that the movant is not entitled to judgment as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56). The party seeking summary judgment can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence fails to meet some element of

its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323.

When the moving party has met his burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P 56 (e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on his pleadings." 477 U.S. at 324. "The plain language of Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 , 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Substantive law determines which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248. Issues of fact are "'genuine' only if a reasonable jury considering the evidence presented could find for the nonmoving party."

*Anderson*, 477 U.S. at 249. Material facts affect the outcome of the trial under governing law. 477 U.S. at 248. To determine whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 249; *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and if the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c).

## II. Breach of Contract Claims

*A. Express Breach of Contract Claims*

AFA alleges Cessna has breached the express terms of their marketing agreement by failing to begin marketing activities by the date contracted. Paragraph "2" of the marketing agreement reads as follows:

> "For the period beginning **not earlier than 180 calendar days prior to the delivery** of Citation CJ-1...Cessna will initiate marketing activities toward the sale of the Aircraft with its delivery concurrent with Cessna's delivery of Citation CJ-1...to Andrews Flight."

(Emphasis added). The plaintiff interprets the phrase "not earlier than" to mean "at least." Because the day Cessna began marketing the S/II (January 22) was less than 180 days before the proposed delivery date (May 1), the plaintiff alleges Cessna had not advertised the S/II to the extent the contract demanded, and declares Cessna in breach.

Cessna, on the other hand, asks the court to read the provision as written: "not earlier than." The marketing campaign *cannot* begin *earlier* than 180 days before delivery, though it

*may* begin *later* than 180 days before delivery. This provision, Cessna argues, is not in the agreement to mandate a certain amount of time for marketing activities, but to ensure that the used plane will not be sold more than 180 days before the new plane is delivered, ensuring the transaction qualifies for a "like kind" federal tax treatment. Given this reading, Cessna's commencement of marketing was within the terms of the contract.

The defendant's interpretation is consistent with the plain meaning of the contract, and does comport with federal tax statutes. The plaintiff's reading of the phrase, on the other hand, runs counter to what the paragraph actually *says*. Because the contract language is not ambiguous, the court finds that the language means what it says: marketing will begin no earlier than 180 calendar days prior to delivery of the CJ-1. The provision does not require that marketing begin *at least* 180 calendar days prior to such delivery. No breach of contract has occurred under Paragraph "2" of the marketing agreement.

The plaintiff next alleges a breach of Paragraph "3" of the marketing agreement, which reads:

> "The offer price to the general public for the Aircraft to be sold in the condition described in Paragraph 5 in the Trade-in Agreement at the time of delivery of the new Citation CJ-1 will be **established 7 months prior to delivery of the Citation CJ-1** through mutual agreement between Andrews Flight and Cessna based on a review and analysis of resale market conditions for Citation S/II series aircraft which prevail at the time."

(Emphasis in original). The plaintiff alleges that the "offer price" for the S/II was not established until January 22, 2001, five months before the contracted delivery date, thus constituting a breach.

The defendant, in response, characterizes this term as a mere "agreement to agree," incapable of being the basis for a breach of contract suit. "Where the intent of the parties is clear

that they are negotiating with a definite understanding [that] the terms of any contract are not fully agreed upon and a written formal agreement is contemplated, and no valid, enforceable contract is to exist until the execution of such an agreement, a binding contract does not come into existence in the absence of such execution." *Weil & Associates v. Urban Renewal Agency*, 479 P.2d 875, 884 (Kan. 1971). Here, the parties have only set one term: that they plan to make an agreement on price seven months prior to the delivery of the CJ-1. But they had yet to agree on other material terms, most notably the price of the S/II. Because more was left to this agreement than execution, it is not a binding contract term, and thus cannot be the basis of AFA's breach of contract claim.

In sum, AFA failed to prove that any express term of its agreements with Cessna have been breached as a matter of law.

B. *Implied Covenant of Good Faith*

The plaintiff also alleges a breach of the implied covenant of good faith, claiming the defendant purposefully lagged in its resale efforts. Essentially, AFA claims Cessna dawdled so it could recoup the used S/II at a low price ($2.95 million) and then resell it after the transaction concluded for a profit. Kansas law implies "a duty of good faith and fair dealing in every contract. Parties shall not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bonanza, Inc., v. Mclean*, 747 P.2d 792 (Kan. 1987). "In order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, [a plaintiff] must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term

in the contract which the defendant allegedly violated by failing to abide by the good faith spirit of that term." *Britric Soft Drinks Ltd. v. ACSIS Technologies, Inc.*, 265 F. Supp. 2d 1179, 1188 (D. Kan. 2003) (citations omitted).

Admittedly, the plaintiff has satisfied the first, procedural prong of this test[2]. The court takes issue, however, with the second prong. The marketing agreement's terms state that Cessna is to engage in "marketing activities," but no descriptions or adjectives state how these activities might take place. The plaintiff argues in its responsive brief that "the defendants acted in bad faith...by refusing to begin marketing the plaintiff's used aircraft...in failing to aggressively market the aircraft as Cessna had promised, and in failing to follow-up on prospects obtained for Cessna by plaintiff at plaintiff's expense." These objections are not based on violations of the contract itself, but instead look to oral discussions that took place before the contracts were signed. Thus, a preliminary question the court must decide is whether these extraneous oral comments should be construed as being terms of the contract.

"When a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible." *Decatur Co. Feed Yard, Inc. v. Fahey*, 974 P.2d 569 (Kan. 1999) (citations omitted). "Whether a contract is ambiguous is a matter of law. When the court is examining a contract for the purpose of determining whether it is ambiguous, it must give the language a natural and reasonable interpretation. As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction." *Id.* (citations omitted). "To be ambiguous, a contract must contain provisions or

---

[2] The court will assume, *arguendo*, that merely 'pleading' breach of contract is enough to satisfy this element. Obviously, if this test required the plaintiff to first plead a *meritorious* breach of contract claim–as many states, including Alabama, do–this prong would not be satisfied.

language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning." *Simon v. Nat'l Farmers Org., Inc.,* 829 P.2d 884, 887-888 (Kan. 1992) (citations omitted).

    The marketing agreement's promise of "marketing activities" may lack specificity, but it is hardly ambiguous. The parties, both sophisticated businesses, simply left the details of the S/II marketing campaign for Cessna to establish. If AFA truly desired the agreement to encompass certain "marketing activities," its qualified legal counsel could have negotiated those terms into the agreement. No word or phrase demands a particular construction; rather, AFA now wishes it could rewrite an intentional plainness. The court finds no ambiguity in this agreement, and thus rejects the plaintiff's proffered oral terms. Because Cessna has abided by the parties' marketing agreement, the plaintiff's "good faith" breach of contract claim fails as a matter of law.

    Alternatively, assuming the phrase "marketing activities" *is* ambiguous, and assuming AFA's proffered oral terms are properly considered, the court still doubts an actionable breach occurred. AFA has complained that Cessna did not make good on its alleged promise to "aggressively" market the S/II, or provide "marketing effort[s]...that no one else in the country was even capable of doing." These additional "terms" are so vague that it is unclear exactly what would or would not satisfy them. Further, AFA has not come forward with any evidence of attempts by Cessna to "destroy" or "injure" AFA's rights under the contract, as Kansas law requires.

    AFA's real grievance is this: Cessna failed to do enough to back up its "puffing" that it was the best resale agent AFA could hope for. This kind of commercial dissatisfaction is not the

stuff that breach of contract suits are made of. Federal courts are not charged to be customer service departments; they can only determine whether the law governing contracts has been broken. This court finds it has not. *Even if* the contemporaneous oral discussions are viewed as terms to the marketing agreement, AFA's "good faith" claims fail as a matter of law.

### III. Fraud Claims

The plaintiff focuses on two general occurrences of fraud in this case.[3] First, AFA alleges that Cessna fraudulently represented it could obtain a price for plaintiff's existing S/II aircraft that would allow plaintiff to trade planes for a differential of $200,000 or less, inducing AFA to enter the purchase agreement. Second, AFA alleges that Cessna fraudulently represented that it had the most effective and aggressive used Cessna aircraft sales program in existence, inducing AFA to enter the marketing agreement.

The essential elements required to sustain an action for fraud in Kansas are:

(1) That false (or untrue) representations were made as a statement of existing and material fact;
(2) That the representations were known to be false (or untrue) by the party making them, or were recklessly made without knowledge concerning them;
(3) That the representations were intentionally made for the purpose of inducing another party to act upon them;
(4) That the other party reasonably relied and acted upon the representations made;
(5) That the other part sustained damage by relying upon them.

*Vondracek v. MidState Co-Op, Inc.*, 79 P.3d 197, 200 (Kan. App. 2003). Two elements in particular give the court pause: the first element, requiring fraudulent statements to be *factual* in nature, and the fourth element, requiring objectively reasonable reliance on those statements.

---

[3] The plaintiff in its complaint alleges a count for "obtaining money by false pretenses," but fails to discuss this particular count in its brief. The court will assume the plaintiff has either waived its "false pretenses" count or combined it with the other two allegations of fraud.

**Element #1: "That false (or untrue) representations were made as a statement of existing and material fact..."**

The Kansas Supreme Court has explained the difference between a mere expression of opinion and a misrepresentation that is intended to be relied upon and to induce another party to enter a transaction:

> If one merely states that, in his opinion, no matter what form the words may take, a given result will follow from a given act, no action will lie upon the expression, no matter how much another may have relied thereon to his injury. But if he states that he has, by reason of his observations and experience, particular knowledge of the subject, and knows because of his particular knowledge that a given result will follow from the given act, an action will lie thereon, if it is falsely made, by one who has acted thereon to his injury. The distinction is that in the one instance there is merely the expression of an opinion, while in the other there is a statement of fact blended with the expression of an opinion; there is an implied assertion that he knows facts which justify and make certain his opinion.

*Hawthorne-Mellody, Inc. v. Driessen*, 518 P.2d 446, 452 (1974). Given this standard, AFA's claim that it was fraudulently induced into the marketing agreement by statements that Cessna's marketing activities would be "aggressive" or "unique" appears lacking.[4] The Cessna representative gave his opinion about the efficacy of his company's services, and now AFA has concluded that Cessna's opinion was wrong. These statements were based on one man's personal characterization of Cessna's resale services, and are not indicative of the hard, factual statements that fraud normally attaches liability to. Thus, because AFA cannot satisfy this first element, its claim that it was fraudulently induced to enter the marketing agreement fails as a

---

[4] Kansas law permits parol evidence where a contract is procured or induced by fraud. *See, e.g., Miles Excavating, Inc. v. Rutledge Backhoe and Septic Tank Servs., Inc.*, 927 P.2d 517, 518-19 (Kan. App. 1996).

matter of law.

Because the representation that AFA could buy the new CJ-1 for "$200,000 or less" was based on the Cessna representative's particular knowledge of the market for used planes and AFA's particular S/II model, it survives this element. The $200,000 figure given may have been the Cessna representative's personal projection of how the transaction would result; however, the court believes this particular calculation could not have been arrived at without "particular knowledge" based on "observations and experience" in the field of used aircraft sales. *Hawthorne-Mellody,* 518 P.2d at 452.

**Element #4: "That the other party reasonably relied and acted upon the representations made..."**

AFA claims that it relied upon Cessna's representations that it would only take $200,000 of "new money" to purchase the CJ-1 when it entered the purchase agreement. The court believes this reliance is unreasonable as a matter of law. The purchase agreement and trade-in agreement make clear that, in the event the S/II could not be sold, the plane could be traded in for a particular, negotiated amount. AFA knew the trade-in amount of the S/II was $2.95 million; it also knew the agreed price for the CJ-1 was $3.82 million. A sophisticated business, with sophisticated advisors, would have understood that a very possible outcome of the contract would be paying $870,000 out-of-pocked for the CJ-1. Because AFA cannot satisfy this fourth element, its claim that it was fraudulently induced to enter the purchase agreement fails as a matter of law.

Because the plaintiff cannot substantiate a *prima facie* case of fraud or breach of contract, and because the court cannot find a genuine issue of material fact, the court hereby GRANTS the

defendant's motion for summary judgment in its entirety.

### IV. Motions to Strike

Also pending are the parties' respective motions to strike. Both motions ask the court to strike the "Facts" section from the opposing party's brief as punishment for not following the court's guidelines on briefs. While the authors of both briefs have unnecessarily made their "facts" an extension of their argument, the court DENIES both of these motions, as the court considered all filings submitted in coming to its conclusion on the motion for summary judgment. The mercy exhibited here should not be viewed as any indication that the court will tolerate such deviations from its guidelines in future briefs.

DONE and ORDERED this 26th day of January, 2004.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE